**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------X
                           :

**COMMAND CINEMA CORP.,**
                           :

                           :

             **Plaintiff,**     :

                           :

   - against -               :

                           :

**VCA LABS, INC. d/b/a TRAC TECH**   :
**VIDEO IMAGES,**

                           :

         **Defendant.**   :

                           :
-----------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/17/06

**OPINION AND ORDER**

**05 Civ. 6447 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Command Cinema ("Command") brings this action against VCA Labs ("VCA"), doing business as Trac Tech Labs,[1] for breach of express contract, conversion, and breach of implied contract regarding the loss of two of Command's adult films. VCA now moves to dismiss Command's claim for conversion of both films, breach of implied contract covering both films, and breach of express contract for one of Command's adult films – The Firestorm Trilogy ("FT"). Command has cross-moved for summary judgment on its

---

[1] *See* Amended Complaint ("Compl.") ¶ 2.

conversion claims for both films.  VCA also moves *in limine* to exclude evidence

of Command's lost profits as a measure of damages and to preclude Command's

claim for punitive damages.

## II.   BACKGROUND

The following facts, drawn from the Amended Complaint, are

assumed to be true for the purposes of this motion.  Command is a New York

corporation involved in the production of adult films, including four films entitled

"The Last X-Rated Movie" 1, 2, 3 and 4, and three films entitled "Firestorm" 1, 2

and 3.[2]  VCA is a California-based corporation that does business nationally,

involving reproduction and distribution of entertainment media.[3]

### A.   The Last X-Rated Movie Contract

On or about July 7, 1992, Command and VCA entered into an

agreement providing that VCA was to combine the four Last X-Rated Movies

("LXRM") with out-takes from the films to create a special edition of the film.[4]

Specifically, the parties agreed that VCA would use Command's four original 3/4

---

[2]     *See* Compl. ¶¶ 1, 6.

[3]     *See id.* ¶ 2.

[4]     *See id.* ¶¶ 6-8; *see also* July 7, 1992 Agreement By and Between Trac
Tech Video Images and Command Cinema Corp. ("LXRM Agreement").

2

inch master tapes of the individual films to create two one inch "sub masters."[5]
The contract required VCA to return the 3/4 inch tapes "immediately after the one
inch sub masters [were] made."[6]  The contract further provides that "[n]o other
masters are to be duplicated. . . . [T]his version cannot be sold, shown or loaned to
another party.  The sub one inch masters are the property of Command Cinema
Corp., and are to be returned to Command upon request, along with any and all of
Command's other material."[7]

### B.    The Firestorm Contract

On or about May 31, 1995, Command and VCA entered into an
agreement similar to the LXRM contract to produce a special edition of
Command's Firestorm ("FT") series, which was to be composed of all three
Firestorm movies and out-takes.[8]  The contract required VCA to return
Command's original 3/4 inch masters after VCA created the one inch sub master.[9]
The contract further provided that

---

[5]     *See* LXRM Agreement at 1.

[6]     *Id.*

[7]     *Id.*

[8]     *See* Compl. ¶¶ 14-15.

[9]     *See* May 31, 1995 Agreement Between Trac Tech Video Images and
Command Cinema Corp ("FT Agreement"), at 1.

> [Command] is delivering 4 3/4" video masters of the films to Trac Tech for the sole and only purpose of duping 1/2" video tapes as ordered by Command. It is understood that no copies of these films, other than those ordered by Command, are to be made, and that the masters will be held in safe keeping by Trac Tech until this Agreement is terminated by either party.[10]

The FT Contract further provides that "[s]hould the duplication master at any time become defective, Command, upon notification, will supply the appropriate 3/4" work master(s) again to Trac Tech."[11]

## C.   Performance of Command and VCA

Between 1995 and 2005, Command repeatedly contacted VCA regarding the masters of its tapes and was each time assured that they were safe.[12] In reliance on VCA's assurances, Command disposed of its 3/4 inch original copies of LXRM and FT around December 2004, when it downsized into a new office.[13] On or about February 2005, VCA discontinued its duplication services and contacted its customers – except for Command – and asked its customers what

---

[10]   FT Agreement at 1.

[11]   *Id.*

[12]   *See* Compl. ¶¶ 21-23.

[13]   *See* 6/9/06 Response to VCA Labs, Inc. Request for Admission ("6/9/06 Command Resp."), Ex. M to 9/22/06 Reply Declaration of Anthony Motta, Counsel to Plaintiff ("9/22/06 Motta Reply Decl."), at 4.

4

they wanted VCA to do with their masters.[14]  Through a bookkeeping error, which mistakenly labeled Command's videos as the property of Adam and Eve Productions ("A&E"), Command's masters were sent to RP Duplicating ("RP").[15]

On or about February 17, 2005, Command learned of the misdelivery of its sub masters to RP and requested their return from VCA.[16]  VCA made no attempt to retrieve the sub masters from RP, and Command attempted to obtain them directly from RP.[17]  Command was eventually able to retrieve all of its masters except for LXRM and FT, which were either lost or stolen at RP or in transit.[18]

## III.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is only appropriate where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is

---

[14]    *See* Compl. ¶¶ 25-27.

[15]    *See id.* ¶¶ 28, 31.

[16]    *See id.* ¶¶ 33-36.

[17]    *See id.* ¶¶ 37-38.

[18]    *See id.* ¶¶ 41-42.

entitled to judgment as a matter of law."[19]   An issue of fact is genuine if "the
evidence is such that a reasonable jury could return a verdict for the nonmoving
party,"[20] while a fact will be deemed material where it "might affect the outcome
of the suit under the governing law."[21]

The moving party bears the burden of demonstrating that there exists
no genuine issue of material fact.[22]   In turn, to defeat a motion for summary
judgment, the non-moving party must raise a genuine issue of material fact that
does "not rely on conclusory allegations or unsubstantiated speculation."[23]   To do
so, it must do more than show that there is "'some metaphysical doubt as to the
material facts.'"[24]   In determining whether a genuine issue of material fact exists,

---

[19]     Fed. R. Civ. P. 56(c).

[20]     *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir.
2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir.
1998)).

[21]     *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir.
2006)(quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

[22]     *See, e.g., Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir.
2005).

[23]     *Id*. (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428
(2d Cir. 2002)(quotation marks omitted).

[24]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting
*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[25]

A district court may grant summary judgment sua sponte, as long as at least one party has moved for summary judgment.[26] "[A] court may grant summary judgment to a non-moving party, provided that party has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried."[27]

## B.    Breach of Contract

To establish a claim for breach of contract under New York law, a party must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages."[28]   The party asserting a breach of contract claim "has the burden of proving the material allegations in the complaint by a fair preponderance of the evidence."[29]   In determining a party's obligations

---

[25]     *See id.* (citing *Anderson*, 477 U.S. at 255).

[26]     *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986).

[27]     *First Fin. Ins. Co. v. Allstate Interior Demolition Corp.*, 193 F.3d 109, 115 (2d Cir. 1999).

[28]     *Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000).

[29]     *V.S. Int'l, S.A. v. Boyden World Corp.*, 862 F. Supp. 1188, 1195 (S.D.N.Y. 1994).

7

under a contract, it is not for the court to "supply a specific obligation the parties

themselves did not spell out."[30] "[I]mpossibility excuses a party's performance

only when the destruction of the subject matter of the contract or the means of

performance makes performance objectively impossible."[31]

 If the language of the contract is ambiguous, New York law requires

the court to interpret a written contract "so as to give effect to the intention of the

parties as expressed in the unequivocal language they have employed."[32]

> When the question is the contract's proper construction, summary
> judgment may be granted when [the contract's] words convey a
> definite and precise meaning absent any ambiguity. . . . Contract
> language is ambiguous if it is capable of more than one meaning
> when viewed objectively by a reasonably intelligent person who
> has examined the context of the entire integrated agreement and
> who is cognizant of the customs, practices, usages, and
> terminology as generally understood in the particular trade or
> business.[33]

The language of a contract is not ambiguous, however, simply because the parties

---

[30] *Tonking v. Port Auth. of New York and New Jersey*, 3 N.Y.3d 486,
490 (2004).

[31] *Ahlstrom Mach. v. Associated Airfreight, Inc.*, 675 N.Y.S.2d 161, 162
(3rd Dep't 1998) (quoting *Kel Kim Corp. v. Central Markets, Inc.*, 70 N.Y.2d 900,
902 (1987)).

[32] *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992).

[33] *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 598 (2d
Cir. 2005) (quotations and citations omitted).

8

urge different interpretations,[34] or if one party's view "strain[s] the contract language beyond its reasonable and ordinary meaning."[35]  "Ascertaining whether the language of a contract is clear or ambiguous is a question of law to be decided by the court."[36]  Ambiguous language, however, should be "construed against the interest of the drafting party."[37]  When a provision of the contract is ambiguous, the court may "consider extrinsic evidence such as the parties' course of conduct throughout the life of the contract."[38]

### C.   Conversion

"Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property that interferes with and is in defiance of a superior possessory right of another in the property."[39]  When the original possession is lawful, "'conversion does not occur until the defendant

---

[34]   *See id.*

[35]   *Id.* (quotations omitted).

[36]   *Lucente v. IBM*, 310 F.3d 243, 257 (2d Cir. 2002).

[37]   *Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003).

[38]   *New York State Law Officers Union v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006).

[39]   *Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53, 53 (2d Cir. 1993) (quoting *Meese v. Miller*, 436 N.Y.S.2d 496, 500 (4th Dep't 1981)).

refuses to return property after demand or until he sooner disposes of the property.'"[40]

   To maintain a claim for conversion, "a plaintiff must show:  (1) 'legal ownership or an immediate superior right of possession to a specific identifiable thing' and (2) that the defendant 'exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'"[41]  "The determination as to whether the relationship is one of bailor and bailee turns on whether there is a relinquishment of exclusive possession, control and dominion over the property."[42]  In addition, there must be "either actual or constructive delivery of the bailed item, as well as actual or constructive acceptance by the bailee."[43]  Constructive delivery does not require that a formal transfer of physical property take place, merely the lawful possession

---

[40] *Id.* at 54 (quoting *Johnson v. Gumer*, 464 N.Y.S.2d 318, 319(4th Dep't 1983)).

[41] *Phansalkar v. Andersen Weinroth & Co., L.P.*, 175 F. Supp. 2d 635, 639 (S.D.N.Y. 2001), vacated on other grounds, 344 F.3d 184 (2d Cir. 2003) (quoting *Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.,* 148 F. Supp. 2d 321, 327 (S.D.N.Y. 2001)).

[42] *Fada Indus. v. Falchi Bldg. Co., L.P.*, 730 N.Y.S.2d 827, 839 (Sup. Ct. Queens Co. 2001).

[43] *Alston v. State*, No. 108146, 2005 WL 2935261, at *3 (Ct. Cl. N.Y. Co. Aug. 19, 2005).

of the personal property by another.[44]  Any misdelivery of a bailed good, whether made in a good faith or not, results in liability of the bailee for conversion.[45]  If a bailee returns property via a common carrier, it has satisfied its duty to deliver the goods to the owner.[46]

A conversion claim may only succeed if the party alleges a wrong that is distinct from any contractual obligations.[47]  There is no conversion action where damages are sought for breach of contract.[48]  Rather, a plaintiff must show acts that were unlawful or wrongful as opposed to violations of contractual rights.[49]

### D.    Breach of Implied Contract

---

[44]    *See id.*

[45]    *See Tokio Marine & Fire Ins. Co. v. Federal  Marine Terminal, Inc.,* 397 F. Supp. 2d 530, 537 (S.D.N.Y. 2005).  *See also Fireman's Fund Ins. Co. v. Wagner Fur Inc.*, 760 F. Supp. 1101, 1105 (S.D.N.Y. 1991).

[46]    *See Maisel v. Gruner & Jahr USA, Inc.*, 452 N.Y.S.2d 192 (1st Dept. 1982).

[47]    *See Briarpatch*, 148 F. Supp. 2d at 328.

[48]    *See Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 452 N.Y.S.2d 599, 600 (1st Dep't 1982).

[49]    *See Calcutti v. SBU, Inc.*, 223 F. Supp. 2d 517, 523 (S.D.N.Y. 2002).

11

In the context of a contract dispute, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."[50]  However, if the express contract is invalid or unenforceable, the plaintiff may seek a remedy *in quantum meruit* under the theory that the law seeks to prevent unjust enrichment.[51]  If the contract remains enforceable regarding the subject matter in dispute, the plaintiff may not seek damages for unjust enrichment.[52]

**E.     Motion in Limine**

The Federal Rules of Evidence favor the admission of all relevant evidence.[53]  A District court will "exclude evidence on a motion in limine only

---

[50]     *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388 (1987).

[51]     *See Integral Control Sys. Corp. v. Consoli. Edison Co.*, 990 F. Supp. 295, 303 (S.D.N.Y. 1998).

[52]     *See Unisys Corp. v. Hercules, Inc.*, 638 N.Y.S.2d 461, 462-63 (1st Dept. 1996) (discussing *La Rose v Backer*, 203 N.Y.S.2d 740, 746 (3rd Dept. 1960), where the court noted that "if this were possible any contractor who had made a poor contract could ignore it and recover in quantum meruit.").

[53]     *See* Fed. R. Evid. 402.

when the evidence is clearly inadmissible on all potential grounds."[54]  "Indeed, courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context."[55]  Even when decided, a court's ruling regarding a motion in limine "is subject to change when the case unfolds . . . even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."[56]

In a breach of contract action, the nonbreaching party may recover the natural and probable consequences of the breach,[57] known as general or market damages.[58]  The nonbreaching party may also seek additional damages – so called special or consequential damages – that flow from the breach of the contract, but these "are restricted to those damages which were reasonably foreseen or contemplated by the parties during their negotiations or at the time the contract was executed."[59]

---

[54]     *United States v. Ozsusamlar*, 428 F. Supp. 2d 161, 164 (S.D.N.Y. 2006).

[55]     *United States v. Chan*, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002).

[56]     *Luce v. United States*, 469 U.S. 38, 41-42 (1984).

[57]     *See Kenford Co. v. County of Erie*, 73 N.Y.2d 312, 319 (1989).

[58]     *See Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000).

[59]     *Kenford*, 73 N.Y.2d at 321.

> In determining the reasonable contemplation of the parties, the
> nature, purpose and particular circumstances of the contract
> known by the parties should be considered, as well as what
> liability the defendant fairly may be supposed to have assumed
> consciously, or to have warranted the plaintiff reasonably to
> suppose that it assumed, when the contract was made.[60]

The nonbreaching party must also prove that it is able to calculate damages with
reasonable certainty.[61]   However, "[t]he law does not require that they be
determined with mathematical precision.  It requires only that damages be capable
of measurement based upon known reliable factors without undue speculation."[62]

These two types of damages seek to provide compensation for
different types of losses.  While general damages seek to compensate the
nonbreaching party for the value of the promised performance, special damages
"seek to compensate a plaintiff for additional losses . . . that are incurred as a
result of the defendant's breach."[63]  Both lost profits and lost assets are special
damages, and when the lost asset is an income-producing asset – sometimes called
a hybrid damage – the fair market value is "a buyer's projections of what income

---

[60]     *Id.* at 319 (internal citations and quotations omitted).

[61]     *See Indu Craft v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995).

[62]     *Ashland Mgmt. v. Janien*, 82 N.Y.2d 395, 403 (1993).

[63]     *Schonfeld*, 218 F.3d at 175-76.

14

he could derive from the asset in the future"[64] discounted to the moment of the

breach and taking into account the uncertainty of future profits.[65]

       In a breach of contract action, a party may recover punitive damages

if it can prove that "the defendant's conduct:  (1) is actionable as an independent

tort; (2) was sufficiently egregious; and (3) was directed not only against the

plaintiff, but was part of a pattern of behavior aimed at the public generally."[66]

## IV.   DISCUSSION

### A.   Breach of Contract

       Although VCA has only moved for summary judgment with respect

to the FT contract, I will also consider summary judgment with respect to the

LXRM contract.[67]  Both parties agree that the FT and LXRM contracts were valid,

that the loss of the films was a breach, and that Command was damaged as a result

---

[64]    *Id.* at 176.

[65]    *See Sharma v. Skaarup Ship Mgt. Corp.*, 916 F.2d 820, 826 (2d Cir. 1990).

[66]    *Schonfeld*, 218 F.3d at 183.

[67]    In a conference call on October 27, 2006, the court notified the parties that it was considering granting summary judgment on both contracts, and permitted the parties to make additional submissions.

of the loss.[68]   Nonetheless, VCA argues that it is entitled to summary judgment on

the FT breach of contract claim because Command destroyed the original  FT 3/4

inch masters before VCA misdelivered the sub masters.[69]   In essence, VCA is

asserting an impossibility defense based on Command's action.

### 1.      VCA Is Not Entitled to Summary Judgment on the FT Contract with Respect to the FT Master Tapes

Impossibility excuses a party's non-performance when the subject

matter of the contract is destroyed, rendering performance impossible.[70]   The FT

contract details VCA's duties and obligations with respect to the sub master and

also provides for the return of the 3/4 inch original masters to Command.   While

Command's destruction of the FT masters made it impossible for it to "supply the

appropriate 3/4" work master(s) again to Trac Tech[,]" Command was only

obligated to do so "[s]hould the duplication master at any time become

defective."[71]   Misdelivery is not the equivalent of a defect.   Defining a defect to

---

[68]      *See* Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Pl. 56.1"), at 1; Defendant's Response to Plaintiff's Statement of Material Facts Pursuant to Local Civil Rule 56.1 ("Def. Resp. 56.1"), at 1.

[69]      *See* Defendant's Answer to the Amended Complaint at 10-11.

[70]      *See Ahlstrom Mach.*, 675 N.Y.S.2d at 162.

[71]      FT Agreement at 1.

16

include a loss due to misdelivery "strain[s] the contract language beyond its reasonable and ordinary meaning."[72]   Indeed, VCA continued to perform under the FT contract between December 2004, when Command destroyed its master tapes, and February 2005, when VCA misdelivered Command's sub masters to A&E. Accordingly, VCA's motion for summary judgment on breach of the FT contract is denied.

### 2.   Command Is Entitled to Summary Judgment on Both the FT and LXRM Contracts

The next question is whether Command is entitled to summary judgment on its breach of contract claim.   The FT contract provides that "the masters will be held in safe keeping by Trac Tech until this Agreement is terminated by either party."[73]   Once again, VCA's misdelivery of the masters to RP resulted in its failure to protect the masters and inability to return them at Command's request on February 17, 2005.[74]   Accordingly, Command is entitled to summary judgment on its breach of contract claim on the FT contract.

---

[72]   *Aetna Cas. & Sur Co.*, 404 F.3d at 598 (quotations and citations omitted).

[73]   FT Agreement at 1.

[74]   *See* Compl. ¶ 36.

17

The LXRM contract provides that "[t]he sub one inch masters are the property of Command Cinema Corp., and are to be returned to Command upon request[.]"[75] VCA's misdelivery to RP, where the masters were subsequently lost, resulted in VCA's failure to return Command's LXRM masters at its request on February 17, 2005.[76] Because it is undisputed that VCA failed to return the LXRM sub masters at Command's request, VCA breached its contract with Command. Command is entitled to summary judgment on its breach of contract claim on the LXRM contract.

## B.    Conversion

Both parties agree that the sub masters were the property of Command and that VCA sent those tapes to RP where they were subsequently lost.[77] The remaining issues in dispute are whether VCA was a bailee of Command's sub masters and whether VCA's actions give rise to a conversion claim given the parties' contractual relationship. The bailment question is tricky because Command never possessed the sub masters created by VCA, although they belonged to Command. Command gave VCA the original 3/4 inch masters so

---

[75]    LXRM Agreement at 1.

[76]    *See* Compl. ¶ 36.

[77]    *See* Pl. 56.1 at 1-2; Def. Resp. 56.1 at 1-2.

18

that VCA could create a one inch sub master.  Once VCA had created the sub

masters, it returned Command's 3/4 inch masters, retaining the one inch sub

masters so that it could make copies for resale.[78]

Command argues that physical delivery of property is not required to

create a bailment and that the essential element is the "'duty to account for the

thing as the property of another.'"[79]  VCA, in turn,  argues that "the crucial

required element of a bailment is that the property must be delivered in the first

instance to the bailee by the bailor."[80]  According to VCA, Command was required

to receive the sub masters and then return them to VCA so that VCA could

perform its contractual duties.

VCA misunderstands the law of bailment.  Physical delivery of goods

is not required.  Rather, a person must relinquish control over goods to another.[81]

Command relinquished its right to possession of the sub masters in order to make

---

[78]     *See* Compl. ¶¶ 8-9, 14-15.

[79]     Plaintiff's Memorandum of Law in Opposition to Defendant's Motion
to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and in Support of Plaintiff's Cross
Motion for Summary Judgment Pursuant to Rule 56 ("Pl. Mem."), at 8-9 (citing
*Armstrong v. Sisti*, 242 N.Y. 440, 444 (1926)).

[80]     *See* Defendant's Memorandum of Law in Support of Motion to
Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Def. Mem."), at 7.

[81]     *See Fada Indus.*, 730 N.Y.S.2d at 839.

19

copies for resale. As a result, Command's actions amounted to constructive

delivery of the sub masters. Thus, Command has established the necessary

elements of a bailment under the FT and LXRM contracts.[82]

Because Command and VCA have a contractual relationship, VCA's

misdelivery and subsequent loss of the masters can only give rise to a conversion

claim if misdelivery is a wrong distinct from VCA's breach of contract.[83] Both the

LXRM and FT contracts contain provisions showing that loss of the masters was

contemplated by the contracts. The LXRM contract provides that "[t]he sub one

inch masters are the property of Command Cinema Corp., and are to be returned to

Command upon request[.]"[84] As this Court has already held, VCA's inability to

return Command's LXRM sub masters is actionable as a breach of contract.

The FT contract provides that "the masters will be held in safe

---

[82]    VCA maintains that an issue of material fact arises from conflicting
evidence regarding RP's attempt to return the sub masters to Command. VCA
claims that RP returned the films via UPS, which lost them in transit. *See* April
21, 2006 Deposition of Diego Gonzalez, Ex. C to Reply Declaration of Jeffrey F.
Reina, Defendant's Counsel, at 161. UPS, however, had no records showing that
it ever picked up the tapes from RP. *See* UPS Investigation Report, Ex. L to
8/31/06 Declaration of Anthony Motta, at 1-2. This dispute is irrelevant because
RP was not a bailee of Command's films.

[83]    *See Briarpatch*, 148 F. Supp. 2d at 328.

[84]    LXRM Agreement at 1.

keeping by Trac Tech until this Agreement is terminated by either party."[85]  I have

already held that VCA's misdelivery of the FT sub masters rendered VCA unable

to assure the safety of those tapes, which is actionable as a breach of contract.

Accordingly, VCA's motion for summary judgment on Command's claims for

conversion of the LXRM and FT masters is granted.

### C.    Breach of Implied Contract

Neither party has alleged that the LXRM or FT contracts were

unenforceable or invalid.  Furthermore, this Court has now determined that VCA's

actions give rise to a claim for breach of contract.  Accordingly, Command's

breach of an implied contract claim must be dismissed.[86]

### D.    Motion in Limine

VCA has moved to preclude evidence of Command's lost profits,

while Command maintains that it merely seeks the value of its lost assets.[87]  To

determine the value of its lost assets, Command plans to call as an expert witness

---

[85]    FT Agreement at 1.

[86]    *See Unisys Corp.*, 638 N.Y.S.2d at 462-63.

[87]    *See* Plaintiff's Memorandum of Law in Opposition to Defendant's
Motion in Limine Seeking to Exclude Evidence of Lost Profits Plaintiff Seeks to
Submit as Part of a Lost Asset Valuation Using a Discounted Cash Flow Analysis,
at 1.

David Sutton, president of VCX Ltd., Inc. which markets, distributes and sells "Classic or Golden Age" adult films.[88]  Based on the sales of almost three hundred Golden Era films in VCX's library, Sutton created a formula for predicting total sales of a re-released Golden Era film based upon its first month's sales.[89]   As there are no first month's sales figures available for LXRM or FT, Sutton estimated the value of the two films using the sales figures of two substitute films that he determined to be of the same caliber – Babylon Pink and Neon Nights – without taking into account the difference in the length of the films or their sales during their initial release.[90]  Command submitted a letter from the accounting firm of Ganer, Grossback and Ganer, LLC, presumably using Sutton's formula and

---

[88]     *See* Disclosure and Report of Expert Testimony Pursuant to Rule 26(a)(2), Ex. B to 8/26/06 Declaration of Jeffrey F. Reina, Defendant's Counsel ("8/26/06 Reina Decl."), at 5.

[89]     This formula uses the variable 'x' to equal the first month's sales. During the first year of a film's release, sales equal approximately two and a half times the amount sold in the first month (2.5x).  In all future years, annual sales average between half of the first month's sales and the first month's sales (.5x and x). According to Sutton, sales remain at this level in perpetuity and do not diminish after the first year.  To predict total sales of a given film, Sutton adds the first year's totals to subsequent years' totals, presumably selecting an arbitrary end year, as it is impossible to calculate damages in perpetuity.  *See* 6/26/06 Deposition of David Sutton, Ex. E to 8/26/06 Reina Decl., at 11-12.

[90]     *See id.* at 10.

sales figures from Babylon Pink and Neon Nights, which calculated the present value of the lost films to be $73,341.[91]

As Command claims that it is seeking to recover for its lost assets rather than lost profits, it must show that lost asset damages were reasonablely foreseen by the parties at the time the contract was executed and that they may be calculated with reasonable certainty.[92]  Because the contracts have no damages provisions, the court must determine what VCA "fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made."[93]

The FT contract provides that "[s]hould the duplication master at any time become defective, Command, upon notification, will supply the appropriate 3/4" work master(s) again to Trac Tech."[94]  Under a plain reading of the contract, VCA could not have reasonably foreseen that it would hold the only remaining masters.  The contract required Command to retain its masters in the event the sub

---

[91]     See 3/23/06 Letter to Anthony Motta from Robert Ganer ("Ganer Letter"), Ex. C to 8/26/06 Reina Decl., at 1.

[92]     See Schonfeld, 218 F.3d at 177.

[93]     Kenford, 73 N.Y.2d at 319 (internal citations and quotations omitted).

[94]     FT Agreement at 1.

master became defective. Command is therefore precluded from seeking lost asset damages for the loss of the FT master.

In contrast, the LXRM contract is unclear on this point. Unlike the FT contract, the LXRM contract contains no provision requiring Command to resupply the masters. It simply provides that the 3/4" originals were to be returned to Command upon creation of the sub master.[95]  VCA could have interpreted this provision to require Command to retain possession of its masters, as it would make little sense to require the return of films if they were to be destroyed. In the alternative, VCA could have assumed that Command requested the return of its masters to destroy them itself, assuring that the films were actually destroyed and not illegally resold. As the LXRM contract language is "capable of more than one meaning when viewed objectively[,]"[96] the contract is ambiguous as to lost asset damages.

The only extrinsic evidence the court has regarding the parties' expectations is deposition testimony from employees of Command and VCA. Command president Howard Winters testified that he repeatedly called VCA to

---

[95]     *See* LXRM Agreement at 1.

[96]     *Aetna Cas. & Sur. Co.*, 404 F.3d at 598.

check on Command's masters, and each time he was told they were in safe

keeping.[97]  According to Sergio Lopez, a former VCA employee, Winters never

explained that VCA was in possession of the sole copy of LXRM because

Command had destroyed its copies.[98]  Neither of these witnesses address the intent

of the parties at the time the contract was created.  Lost asset damages "are

restricted to those damages which were reasonably foreseen or contemplated by

the parties during their negotiations or at the time the contract was executed."[99]

This question must therefore be resolved at trial, where the parties may present

evidence of their intent.[100]

   Although Command may present evidence of the value of LXRM as a

lost asset, it must show that it can calculate such damages with reasonable

certainty.[101]  The formula developed by Command's expert David Sutton

determines damages with reasonable certainty if it is "based upon known reliable

---

[97] *See* Deposition of Howard Winters, Ex. G to 8/31/06 Motta Decl., at 33.

[98] *See* Deposition of Sergio Lopez, Ex. B to Reina Reply Decl., at 12-13.

[99] *Kenford*, 73 N.Y.2d at 321.

[100] *See Chan*, 184 F. Supp. 2d at 340.

[101] *See Indu Craft*, 47 F.3d at 496.

factors without undue speculation."[102]  While one could quibble with Sutton's

choice of substitute films, his formula uses specific, commercially-available data

to calculate the value of a Golden Era adult film.  The data on which Sutton relies

is both 'known' and 'reliable.'  Likewise, this formula is not unduly speculative

because Sutton uses sales from similar substitute Golden Era adult films.  While

VCA is free to disagree with Sutton's choice of films and the period of time for

which damages are calculated, the formula itself is capable of determining

damages with reasonable certainty.[103]  Accordingly, VCA's motion in limine is

granted with respect to the FT contract and denied with respect to the LXRM

contract.

   VCA also moved to exclude Command's request for punitive

damages.  VCA's misdelivery of Command's masters, while unacceptable, was not

"part of a pattern of behavior aimed at the public generally."[104]  It was the result of

---

[102] *Ashland Mgmt.* 82 N.Y.2d at 403.

[103] Of course, Sutton may be cross-examined at trial on his choice of
comparable films.  The jury may then choose to reject Sutton's analysis.

[104] *Schonfeld*, 218 F.3d at 183.

a single data entry mistake affecting a single company.[105]  As a result, VCA's

motion in limine to preclude Command's request for punitive damages is granted.

## V.    CONCLUSION

For the reasons set forth above, VCA's motions for summary

judgement for conversion and implied breach of contract are granted.  VCA's

motion for summary judgment on breach of the FT contract is denied, and its

motion in limine is granted in part and denied in part.  Command's motion for

summary judgment regarding its claim for conversion and implied breach of

contract claim are denied.  Command is entitled to summary judgment on its

breach of contract claims.  The Clerk of the Court is directed to close these

motions [Docket Nos. 24, 33 and 36].  A conference is scheduled for December

21, 2006, at 4:30 pm.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            November 17, 2006

_____

[105]      *See* Compl. ¶¶ 28, 31.

27

28

## - Appearances -

### For Plaintiff:

Anthony Motta, Esq.
130 William Street #603
New York, NY 10038
(212) 791-7360

### For Defendant:

Jeffrey F. Reina, Esq.
Lipsitz Green Scime Cambria LLP
42 Delaware Ave., Suite 120
Buffalo, NY 14202-3294
(716) 849-1333